UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

FRANKLIN COBBS, JR.,

                              Plaintiff,

                                                          9:14-CV-0096
v.                                                         (MAD/TWD)

S. LAMARE,

                              Defendant.

_____

APPEARANCES:                                  OF COUNSEL:

FRANKLIN COBBS, JR., 08-A-3161
Plaintiff pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953

HON. ERIC T. SCHNEIDERMAN                      HELENA LYNCH, ESQ.
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## REPORT-RECOMMENDATION and ORDER

        This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff

Franklin Cobbs, Jr., an inmate of the New York State Department of Corrections and Community

Supervision ("DOCCS"), alleges that a DOCCS employee harassed him.  (Dkt No. 1.)  Currently

pending before the Court is Defendant's pre-answer motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56. (Dkt. No. 35.) For the reasons discussed below, I

recommend that the Court grant Defendant's motion and dismiss this action without prejudice.

## I.     FACTUAL AND PROCEDURAL SUMMARY

Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"). (Dkt. No. 1 at 1.)

He was taken to the Albany Medical Center in late 2013 when he suffered from kidney failure.

*Id.* at 4. He was placed in an infirmary after returning to Upstate. *Id.* On January 15, 2014,

Plaintiff filed a grievance alleging that Defendant "put his hands on" him when he was leaving

the infirmary. *Id.* at 7. He further alleged that Defendant "hit [him] on the head over 5 times and

[on his] chest w[here he] ha[d] a tube going t[o] [his] h[e]art." *Id.*

On January 29, 2014, Plaintiff commenced this action by filing a complaint. (Dkt. No. 1.)

The Superintendent of the facility denied Plaintiff's grievance two days later, on January

31, 2014. (Dkt. No. 35-3 ¶ 9; Dkt. No. 35-5 at 2.) Plaintiff appealed the decision to the Central

Office Review Committee ("CORC") after filing his complaint in this action. (Dkt. No. 35-3 ¶

11.)

Defendant now moves for summary judgment. (Dkt. No. 35.) Plaintiff opposes the

motion. (Dkt. No. 40.) Defendant has filed a reply. (Dkt. No. 41.) Plaintiff has filed a sur-

reply. (Dkt. No. 42.) For the reasons that follow, I recommend that Defendant's motion be

granted.

## II.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment

bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Rather, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[1] fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## III.    ANALYSIS

Defendant argues that this action must be dismissed because Plaintiff did not exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"). (Dkt. No. 35-1.) Defendant is correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2006). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they

---

[1]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3). If an inmate alleges harassment by a DOCCS employee, the inmate's grievance may be sent directly to the facility's superintendent, thereby bypassing the first step. *Id.* § 701.8(b)-(d), (f).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy

issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any such action much be dismissed without prejudice. *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002).

Here, Plaintiff did not exhaust his administrative remedies before commencing this litigation. Plaintiff brought a grievance to the facility's Superintendent, but he filed his complaint in this action before appealing to CORC. Plaintiff admits that he did not wait to "receive a final determination from CORC." (Dkt. No. 39 ¶ 5.) Thus, Plaintiff had not yet exhausted all administrative remedies with regard to his claim against Defendant at the time he filed this suit.

Plaintiff's failure to exhaust, however, does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[2]

---

[2] The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81. *Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Here, Plaintiff argues that administrative remedies were unavailable to him because he "was not given grievance forms or [the Inmate Grievance Procedures] handbook the [w]hole [time] [he] was in the [i]nfirmary." (Dkt. No. 42 at 1.) However, Plaintiff admits that he took advantage of the expedited grievance process and filed a grievance directly with the facility's Superintendent on January 15, 2014. (Dkt. No. 1 at 7.) The Superintendent made a timely determination on January 31, 2014. (Dkt. No. 35-3 ¶ 9; Dkt. No. 35-5 at 2.) Plaintiff then appealed the superintendent's decision to CORC. (Dkt. No. 35-3 ¶ 11.) Thus, there is no genuine dispute that the administrative grievance process was available to Plaintiff.

Second, if administrative remedies were available,

> the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense.

*Hemphill*, 380 F.3d at 686 (citations omitted). Here, Defendant preserved the exhaustion defense by asserting it in his motion. (Dkt. No. 35-1; *Jones*, 549 U.S. at 216; *Alster v. Goord*, 745 F. Supp. 2d 317, 332 (S.D.N.Y. 2010).) There is no evidence in the record that Defendant's own conduct estops him from asserting the exhaustion defense. *Cf. Ziemba v. Wezner*, 366 F.3d 161, 162-64 (2d Cir. 2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison).

Third, if the remedies were available and defendant did not forfeit, and was not estopped from raising, the non-exhaustion defense, "the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Hemphill*, 380 F.3d at 686 (citations and internal quotations omitted). Justification "must be determined by looking at the circumstances which might understandably lead . . . uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord*, 380 F.3d 670, 678 (2d Cir. 2004).

Plaintiff argues that special circumstances exist because he "was unaware of the grievance procedures and had [a] lack of knowledge of the CORC appeal process." (Dkt. No. 42 at 1.) A plaintiff's failure to exhaust his remedies cannot be excused merely because "he did not know there were any other steps" in the grievance procedure. *Smith v. City of New York*, No. 12 Civ. 3303 (CM), 2013 U.S. Dist LEXIS 144122, at *56, 2013 WL 5434144, at *20 (S.D.N.Y. Sept. 26, 2013) (citation omitted).[3] Here, Plaintiff in fact used the administrative grievance procedure, showing that he was aware of the grievance procedure and the CORC appeal process. Thus, there is no genuine dispute that Plaintiff was aware of the grievance procedure.

Plaintiff also claims that along with having no "IGP Booklet on [h]ow to file a [g]rievance . . . [he] was be[ing] moved from jail to jail and take[n on] outside trips to [t]he medical center." (Dkt. No. 40 ¶ 5.) "[T]he mere fact that plaintiff has been transferred to another prison facility does not necessarily render the exhaustion requirement moot." *Rodriguez v. Senkowski*, 103 F. Supp. 2d 131, 134 (N.D.N.Y. 2000). Moreover, Plaintiff in fact filed a

---

[3] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

grievance and appealed it. Thus, his transfer is not a special circumstance justifying his failure to properly exhaust his administrative remedies before filing this lawsuit.

For the foregoing reasons, I recommend that Defendant's motion for summary judgment should be granted. An administrative grievance process was available to Plaintiff and he failed to exhaust administrative remedies before filing this suit against Defendant. Plaintiff was not prevented by the actions of prison officials, including the named Defendant, from filing a grievance or from pursuing his administrative remedies, including appealing to the Superintendent and appealing to CORC.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 35) in this action be **<u>GRANTED</u>** based upon Plaintiff's failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a); and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Smith v. City of New York*, No. 12 Civ. 3303 (CM), 2013 U.S. Dist LEXIS 144122, 2013 WL 5434144 (S.D.N.Y. Sept. 26, 2013).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: April 17, 2015
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2013 WL 5434144
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Hugh SMITH, Victor Marte, Devon Lloyd,
Winston Cowell, Dorian Carr, Brandi Simmons,
Mamadou Barry, and Chayrmar Brown, Plaintiffs,
v.
CITY OF NEW YORK, Dora B.
Schriro, and Luis Rivera, Defendants.

No. 12 Civ. 3303(CM).  |  Sept. 26, 2013.

### DECISION AND ORDER

McMAHON, District Judge.

**\*1** Plaintiffs Hugh Smith, Victor Marte, Devon Lloyd, Winston Cowell, Dorian Carr, Brandi Simmons, Mamadou Barry, and Chayrmar Brown ("Plaintiffs") bring this action under 42 U.S.C. § 1983 and 42 U.S .C. § 2000cc et seq., the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), against the City of New York, Dora B. Schriro, the Commissioner of the New York City Department of Correction ("DOC"), and Luis Rivera, the warden of the Anna M. Kross Center ("AMKC") (together, "Defendants"). Plaintiffs claim that they have not been afforded proper accommodation to practice their Muslim religion while housed at AMKC, a correctional facility on Rikers Island.

For the reasons set forth below, Defendants' motion for summary judgment is granted as to Plaintiffs Smith, Marte, Cowell, Carr, and Barry. Before I can decide the motion insofar as it is directed to Plaintiffs Lloyd, Simmons, and Brown, the Court will have to hold a hearing to ascertain whether those plaintiffs are excused from exhausting their administrative remedies before filing this lawsuit.

### BACKGROUND

#### I. Plaintiffs' Allegations
The facts are taken from the Second Amended Consolidated Complaint ("SACC") and assumed to be true for the purposes of the motion to dismiss.

Plaintiffs are all Muslims who were housed in AMKC, a correctional facility on Rikers Island, between 1991 and 2012. Several plaintiffs remain incarcerated at AMKC today. Each plaintiff asserts that he has been prevented from properly practicing his religion while housed at AMKC because the facility fails to provide adequate prayer facilities, Halal meals, and religious materials, such as the Koran, for Muslim inmates.

While prisoners of other religions were provided with dedicated prayer spaces, Plaintiffs had to conduct their regular congregate services and daily prayers in the AMKC gymnasium. (SACC ¶ 29.) Plaintiffs allege that those basic religious services and prayers were constantly interrupted by, among other things, Corrections Officers or other inmates playing sports, having parties, socializing and taking their meals, or crossing from one end of the gym to the other. (*Id.*) The gymnasium's leaky roof allowed pools of water to collect on the floor, further interrupting the religious services. (*Id.*) Furthermore, AMKC did not provide a dedicated space for Plaintiffs to wash their hands and feet in preparation for prayer, despite the need for such facilities to conduct the appropriate pre-prayer ritual. (*Id.* ¶¶ 3, 29.)

Some days, Plaintiffs were forced to pray in the AMKC Christian chapel. The presence of pews made it impossible to kneel correctly for prayer, and images posted in the chapel, which were discordant with Muslim beliefs, further disrupted Plaintiffs' prayer. (*Id.* ¶ 29.)In other instances, Plaintiffs were not permitted to attend services at all because Corrections Officers refused to respond to requests to escort Plaintiffs from their housing facilities to the designated place of worship or cancelled services in order to hold basketball games. (*Id.*) While detainees of other religions were provided copies of relevant religious texts, and appropriate religious materials, Plaintiffs were not afforded copies of the central Muslim text, the Koran. (*Id.* ¶¶ 3, 30 .)

**\*2** While AMKC accommodated the special dietary needs of other inmates, the DOC failed to provide Plaintiffs with proper Halal meals. (*Id.* ¶¶ 27, 31, 41.)Although DOC Directives required strict separation of Halal foods from General Population ("GP") foods when stored, cooked, and served, the actual practice in AMKC did not meet this requirement. (*Id.* ¶¶ 25–27, 31.)To the contrary, AMKC kitchen staff routinely prepared purportedly Halal meals with non-Halal ingredients, or mixed purportedly Halal foods with non-Halal foods in the preparation and cooking of the meals, making it impossible to distinguish the two. Once prepared,

staff arbitrarily labeled some of the food "Halal" and served it to Plaintiffs. (*Id.* ¶ 31.)

In addition, AMKC regularly served to Plaintiffs chicken that was undercooked and bloody, rendering any such chicken —Halal or not—unsuitable for consumption by practicing Muslims. (*Id.* ¶ 31.)Halal meal trays and GP meal trays were washed in the same dishwashers and stacked together. (*Id.* ¶¶ 27, 31.)As a result, Halal meal trays were visibly contaminated with meat particles and grease from prior, non-Halal meals. (*Id.*) Due to these conditions, some or all of the Plaintiffs often did not eat the meat they were served, and were left to buy snacks from the commissary as a substitute for those meals. (*Id.* ¶ 31.)

## II. Procedural History

Each of the plaintiffs, appearing *pro se,* submitted individual complaints related to this action at varying points in time, the first on April 25, 2012. On November 16, 2012, all of the cases were consolidated under the above caption and docket number 12 Civ. 3303.

On December 4, 2012, the Court appointed Freshfields Brockhaus Deringer U.S. LLP as pro bono counsel for Plaintiffs.

On February 11, 2013, Plaintiffs' counsel filed the Second Amended Consolidated Complaint ("SACC"), consolidating all complaints by the plaintiffs in this action.

On February 28, 2013, Defendants moved to dismiss the SACC in its entirety on various grounds. As a threshold matter, they assert that: (1) Plaintiff Hugh Smith is barred from bringing this action by his settlement with the City of New York in another case and (2) Plaintiffs have failed to exhaust their administrative remedies. Additionally, they move for dismissal under Rule 12(b)(6) for failure to state a claim (3) against Commissioner Schriro and Warden Rivera for individual liability under § 1983, (4) against the City of New York for municipal liability under *Monell,* (5) under RLUIPA, (6) under the Free Exercise Clause, and (7) under the Equal Protection Clause.

Pursuant to orders entered by the Court on November 16, 2012 and May 31, 2013, the parties have submitted evidence regarding the issue of Plaintiffs' failure to exhaust their administrative remedies. Since the parties have been given ample notice and opportunity to submit evidence in connection with the exhaustion issue, I am converting the motion to dismiss on that issue only to a motion for summary judgment. *See* Fed.R.Civ.P. 12(d).

## DISCUSSION

**\*3** For the reasons given below, Plaintiff Smith's claims are dismissed as barred by his settlement with the City of New York in another case, and the claims of Plaintiffs Marte, Cowell, Barry, and Carr are dismissed for failure to exhaust administrative remedies.

No plaintiff has exhausted his administrative remedies; however, there is an issue of fact as to whether Plaintiffs Lloyd, Simmons, and Brown are excused from the requirement to exhaust administrative remedies under *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004). The Court will hold a hearing on the issue.

Plaintiffs' allegations, if true, raise a serious question as to whether inmates at AMKC are afforded adequate accommodation to practice their Muslim religion. If the practices complained of are continuing, the plaintiffs whose claims are dismissed for failure to exhaust (assuming they are still incarcerated at AMKC) are free to file a grievance, exhaust their administrative remedies, and file a new complaint, which will be consolidated with this action.

Because exhaustion remains a dispositive issue in the case, I do not reach the merits issues in Defendants' motion to dismiss. That motion is denied with leave to renew if the complaint is not dismissed in its entirety following the exhaustion hearing.

## I. Standards for Determining the Motion

### A. Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003); *see also Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal,* 129 S.Ct. at 1950–51.

In deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000).

**B. Motion for Summary Judgment**

**\*4** A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment ." *Anderson,* 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. Instead, sufficient

evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.

**II. Plaintiff Smith's Claims Are Dismissed Because They Are Barred by a Settlement in Another Case**

Defendants move to dismiss any and all claims brought by Plaintiff Hugh Smith on the grounds that he is barred from bringing this action by a settlement he entered into with the City of New York in another case.

On May 24, 2012, approximately one month after commencing the instant action, Plaintiff Hugh Smith commenced another action in the Southern District of New York entitled *Smith v. Cameron,* No. 11 Civ. 4049.In *Smith v. Cameron,* Smith alleged that the City of New York and several DOC employees violated his federal and state civil rights. *See* Complaint in *Smith v. Cameron,* No. 11 Civ. 4049, Docket No. 2.

On June 11, 2012, Smith and the defendants in the case stipulated to terms of settlement, whereby the City of New York agreed to pay Smith $750.00 in exchange for, *inter alia,* Smith's release of the City and its employees from various claims. *Id.,* Docket No. 35.On June 14, 2012, Judge Baer so ordered the Stipulation of Settlement and Order of Dismissal (the "Stipulation") agreed to by the parties. *Smith v. Cameron,* Docket No. 35.

The Stipulation states in pertinent part:

> In consideration for the payment of this sum, plaintiff agrees ... to release the defendants and any present or former employees and agents of the City of New York or any entity represented by the Office of the Corporation Counsel, from any and all liability, claims, or rights of action alleging a violation of plaintiff's civil rights, from the beginning of the world to the date of the General Release, including claims for costs, expenses, and attorneys' fees.

**\*5** *Id.* ¶ 2.

Paragraph 4 of the Stipulation also provides:

> Nothing contained herein shall be deemed to be an admission by the defendants that they have in any manner or way violated plaintiff's rights, or the rights of any other person or entity, as defined in the constitutions, statutes, ordinances, rules or regulations of the United States, the State of New York, or the City of New York or any other rules or regulations of any department or subdivision of the City of New York. This stipulation shall not be admissible in, nor is it related to, any other litigation or settlement negotiations.

In connection with the settlement, Plaintiff Smith signed a "General Release," dated June 5, 2012. (Longley Decl. dated November 30, 2012, Ex. A ("General Release" dated June 5, 2012).) Tracking the language from the stipulation, Smith released and discharged the defendants in *Smith v. Cameron,* the defendants' successors or assigns, "and all past and present officials, employees, representatives and agents of the City of New York or any entity represented by the Office of the Corporation Counsel, from *any and all liability, claims, or rights of action alleging a violation of [Smith's] civil rights, from the beginning of the world to the date of this General Release,* including claims for costs, expenses, and attorneys' fees."(*Id.*) (emphasis added).

The Court can and must consider both the Stipulation and the Release that Smith signed. "It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes."*Vasquez v. City of New York,* No. 99 Civ. 4606(DC), 2000 WL 869492, at *1, n. 1 (S.D.N.Y. June 29, 2000). The Stipulation was so ordered by Judge Baer and appears on the public docket of the *Smith v. Cameron* action, and the Release, while not appearing on the docket, was incorporated by reference into the Stipulation.

Courts construe settlement agreements and releases according to general principles of contract law. *See, e.g., Collins v. Harrison–Bode,* 303 F.3d 429, 433 (2d Cir.2002). In New York, "a release that is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced."*Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 463 (2d Cir.1998).

Under the plain language of the Release, Smith is barred by the settlement from bringing any civil rights claims in this action, which was brought by Smith on April 25, 2012, before the Release was signed on June 5, 2012.

Plaintiff Smith challenges this reading of the Release, arguing that the Release relates only to *Smith v. Cameron* and not to any other litigation. Smith is plainly incorrect. The Release is unambiguous; it releases the City and employees of the City from *"any and all* liability, *claims,* or rights of action" alleging a violation of Smith's civil rights, "from the *beginning of the world to* the date of this General Release."(*Id.*) (emphasis added). This means *all* civil rights claims, not just the claims alleged in *Smith v. Cameron.*Such language has routinely been held to bar claims brought in a separate action that is not the subject of the settlement, as long as those claims were brought prior to the date of the release. *See, e.g., Robinson v. Pierce,* No. 11 Civ. 5516(GBD) (A.TP), 2012 WL 833221, at *6 (S.D .Y. Mar. 13, 2012).

**\*6** Paragraph 4 of the Stipulation does not, as Smith contends, mean that the stipulation and the release are not admissible in this litigation. That section clearly relates to (and precludes) the use of the stipulation to demonstrate the City's purported liability for violation of Smith's or anyone else's rights in another litigation or settlement negotiation. It would be an implausible interpretation of that provision to conclude that it bars the City from seeking to enforce the terms of the stipulation in another action where the plaintiff is seeking damages for claims he released through that stipulation—and the Release—in *Smith v. Cameron.*

Plaintiff Smith continues that, even if the Release is admissible in this litigation, it released the City only from "civil rights" claims, and not from a RLUIPA claim. This is incorrect. RLUIPA is a statutory civil rights scheme, which falls under the purview of the U.S. Department of Justice Civil Rights Division. *See* http://www.justice.gov/crt/about/hce/. The RLUIPA specifically protects the civil rights of people confined to state or local institutions to practice their religion. *See id.;* http://www.justice.gov/crt/about/spl/. As such, the Release applies to Smith's RLUIPA claim as well as his section 1983 claim.

Finally, in Plaintiffs' opposition brief, Plaintiff Smith argues that he should be afforded the opportunity to present evidence that the Release was "procured by fraud, undue influence, or some other illegal means."*Kraft Foods, Inc. v. All These*

*Brand Names, Inc.,* 213 F.Supp.2d 326, 330 (S.D.N.Y.2002). The affidavit he submitted also indicates that he has a learning disability that affects his reading comprehension. But if Smith wishes to press the claim that the settlement and Release were procured by fraud or some other illegal means, and so void the agreements, he must do so before Judge Baer, not me. Only if the Release were set aside in the other lawsuit could Smith bring his claims in this action.

Smith's claims as asserted in this suit are dismissed.

However, Smith has *not* released any claims that had not been asserted as of the date of his Release. If the practices of which he complained are continuing and he is still subject to them, he can file a grievance, exhaust his administrative remedies, and file a new complaint.

### III. Legal Standards for Exhaustion of Administrative Remedies

The Court addresses two questions with respect to exhaustion: (1) whether Plaintiffs have exhausted their administrative remedies consistent with the requirements of the Prison Litigation Reform Act ("PLRA") and (2) if they have not exhausted their remedies, whether Plaintiffs are excused from the exhaustion requirements under relevant Second Circuit precedent.

#### A. Exhaustion Requirements Under the PLRA

The PLRA states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."42 U.S.C. § 1997e(a) (2006) (emphasis added). The Supreme Court "has held that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."*George v. Morrison–Warden,* No. 06 Civ. 3188, 2007 WL 1686321, at *2 (S.D.N.Y. Jun. 11, 2007) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Further, in *Woodford v. Ngo,* 548 U.S. 81 (2006), the Supreme Court held that "untimely or otherwise procedurally defective administrative grievance[s] or appeal[s]" do not satisfy the PLRA, which requires "proper exhaustion."

**\*7** The Inmate Grievance Resolution Program ("IGRP") that was in effect at the time Plaintiffs filed their grievances is set forth in DOC Directive 3375R–A. It requires an inmate

to: "(1) file an informal complaint with the Inmate Grievance Resolution Committee ("IGRC"); (2) in the event that informal resolution is not reached within five days, request a formal hearing before the IGRC; (3) appeal any unfavorable decision by the IGRC to the Commanding Officer; (4) appeal any unfavorable decision by the Commanding Officer to the Central Office Review Committee [ ("CORC") ]; and (5) appeal any unfavorable decision from the [CORC] to the New York City Board of Correction."*Myers v. City of New York,* No. 11 Civ. 8525(PAE), 2012 WL 3776707, at *4–5 (S.D.N.Y. Aug. 29, 2012) (referring to DOC Directive 3375R–A), *appeal dismissed* (Nov. 8, 2012), *aff'd,* 12–4032, 2013 WL 3603784 (2d Cir. July 16, 2013).

The IGRP provides for specific time frames for each level of the grievance process. If an inmate does not receive a response within these specified time frames, he must appeal to the next level of the process in order to properly exhaust his administrative remedies. *See Jones v. Meckley,* No. 07 Civ. 10414(RWS), 2010 WL 148616, at *3–4 (S.D.N.Y. Jan. 12, 2010). It is well settled that an inmate must complete all requisite steps of the IGRP in order to fully exhaust his administrative remedies; even if he does not receive a response at a particular step in the proceedings, he must proceed in timely fashion to the next step. *See, e.g., Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *17 (S.D .N.Y. Sept. 1, 2010) (collecting cases), *report and recommendation adopted,*No. 09 Civ. 3722(SHS), 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

#### B. Excuses for Exhaustion Under the *Hemphill* Analysis

In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit held that when an inmate plausibly seeks to challenge defendants' contention that he has failed to exhaust administrative remedies under the PLRA, the Court must analyze his claim under a three-part test. *See Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007). The Court must consider: (1) whether the administrative remedies were, in fact, available to the prisoner; if not, the exhaustion requirement is inapplicable; (2) if those remedies were available, whether "the defendants are estopped from raising the affirmative defense of non-exhaustion because their actions inhibited the inmate's exhaustion of remedies, or because they forfeited the defense by failing to raise or preserve it,"*Andrews v. Cruz,* No. 04 Civ. 566(PAC)(RLE), 2010 WL 1142010, at *3 (S.D.N.Y. March 9, 2010); and, finally, (3) whether "special circumstances" have been plausibly alleged that justify the prisoner's failure to exhaust. *See Hemphill,* 380 F.3d at 686.

Unavailability of administrative remedies is governed by an objective test—"that is, would a similarly situated individual of ordinary firmness have deemed [grievance procedures] available." *Hemphill,* 380 F.3d at 688 (internal quotation marks omitted). However, courts in this district have consistently held that, "Where 'the record reflects that [the inmate] continued to file grievance after grievance during the period of alleged unavailability, it is apparent that a reasonable person of ordinary firmness in [the inmate's] position, as well as [the inmate] himself, would not have thought that administrative remedies were unavailable." *Rivera v. Anna M. Kross Ctr.,* No. 10 Civ. 8696, 2012 WL 383941, at *4 (S.D.N.Y. Feb. 7, 2012) (quoting *Kasiem v. Switz,* 756 F.Supp.2d 570, 571 (S.D.N.Y.2010) and collecting cases). A prisoner's "perception that the [facility's] grievance program was ineffective or that the filing of grievances was futile is insufficient to negate the PLRA's exhaustion requirement." *Shariff v. Coombe,* 655 F.Supp.2d 274, 286(BSJ) (S.D.N.Y.2009).

**\*8** "Courts have held that remedies are not available where prisoners are not informed of their existence." *Burgess v. Garvin,* No. 01 Civ. 10994(GEL), 2004 WL 527053, at *3 (S.D.N.Y. Mar. 16, 2004)."[A]n institution keeps an inmate ignorant of the grievance procedure when correctional officials either fail to inform him of the procedure altogether or fail to provide him with access to materials which could otherwise educate him about use of that process."*See Arnold v. Goetz,* 245 F.Supp.2d 527, 538 (S.D.N.Y.2003).

An inmate may invoke estoppel in the PLRA context where the "defendants took affirmative action to prevent him from availing himself of grievance procedures."*Amador v. Andrews,* 655 F.3d 89, 103 (2d Cir.2011) (internal quotation marks omitted)."Prior cases have held that verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers constitute such affirmative action."*Id.* at 103.The Second Circuit has indicated that the theory of equitable estoppel only applies to estop a defendant from asserting the affirmative defense of non-exhaustion if his own actions inhibited the inmate from exhausting. *See Hemphill,* 380 F.3d at 688–89;*see also Martin v. City of New York,* No. 11 Civ. 600(PKC) (RLE), 2012 WL 1392648, at *7 (S.D.N.Y. Apr. 20, 2012). However, the inmate must have "reasonably underst [ood] that pursuing a grievance through the administrative process will be futile or impossible."*Kasiem,* 756 F.Supp.2d at 577 (internal quotation marks omitted). Where an inmate "actually did pursue grievances and appeals throughout the

time period in question, ... any inference from his allegations that he reasonably understood the grievance process to be futile" is defeated. *Id.*

Finally, despite *Porter,* the Second Circuit has recognized that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified."*Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004). The inquiry with respect to special circumstances is the same as that for unavailability—namely, "whether a similarly situated individual of ordinary firmness would have been deterred from following regular procedures."*Hemphill,* 380 F.3d at 690 (internal citation and quotation marks omitted).

The most commonly recognized special circumstances are where the inmate reasonably misunderstood the relevant grievance procedures. *See Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006); *Giano,* 380 F.3d at 678–79. "Special circumstances" could include situations where a plaintiff's "reasonable" interpretation of applicable regulations regarding the grievance process led him or her to conclude that the dispute could not be grieved.*Hemphill,* 380 F.3d at 689;*see also Giano,* 380 F.3d at 676–77.

**\*9** Where an inmate is threatened with retaliation if he files a grievance, his failure to exhaust his administrative remedies may (or may not) be excusable on all three grounds. *See Hemphill,* 380 F.3d at 686–91;*see also Hepworth v. Suffolk County,* No. 02 Civ. 6473, 2006 WL 2844408, at *5– 8 (E.D.N.Y. Sept. 29, 2006). In *Hemphill,* the inmate alleged that he sent a letter directly to the prison's superintendent instead of filing a grievance because he had been threatened with retaliation. In remanding the case, the Second Circuit directed the district court to consider the interplay between the alleged threat and the inmate's decision to write directly to the prison's superintendent, rather than file a grievance. *Id.*

*Woodford*'s interpretation of the PLRA's exhaustion requirement through the lens of the administrative law doctrine of exhaustion, and its focus on the benefits of strict adherence to grievance procedures, casts some doubt on court-created exceptions to exhaustion like *Hemphill.See Zappulla v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033 (S.D.N.Y. Apr. 5, 2013). The Second Circuit itself mentioned that *Woodford* could affect *Hemphill* in *Amador,*

655 F.3d at 102, *Macias,* 495 F.3d at 43 n. 1, and *Ruggiero,* 467 F.3d at 176—although in some recent cases, *Hemphill* has been treated as good law. *See, e.g., Messa v. Goord,* 652 F.3d 305, 309–10 (2d Cir.2011); *Pooler v. Nassau Univ. Med Ctr.,* 848 F.Supp.2d 332, 340 (E.D.N.Y.2012). In the absence of a clear indication that *Hemphill* has been overruled, this Court has no choice but to treat it as good law.

## IV. Analysis of Plaintiffs' Exhaustion of Administrative Remedies

The facts concerning each plaintiff's grievance history—outlined below—are taken from the individual plaintiffs' declarations and attached exhibits and the Declaration of Serena Longley in Support of Defendants' Motion to Dismiss, dated May 3, 2013 ("Longley Decl.") and the attached exhibits, which include Plaintiffs' records from DOC's Inmate Grievance Resolution Program ("IGRP"). Unless otherwise indicated, all references to exhibits are to the exhibits attached to the Longley Declaration.

In their declarations, several plaintiffs explain apparent inconsistencies between the grievance history as alleged in the original, *pro se* complaints they filed in this action (which were later consolidated in the Second Amended Consolidated Complaint), and what is recounted in their declarations. These plaintiffs claim to have misunderstood some of the questions in the *pro se* complaint form they completed, or to have incorrectly copied another plaintiff's complaint. For example, several plaintiffs incorrectly indicated that they had not filed a grievance prior to filing the federal complaint, when DOC records show that they had; in other cases, the plaintiffs have submitted a copy of a grievance form that they claim to have filed, and the DOC has no record of any filing. Any contradictions obviously factor into ultimate findings on credibility and weight, but I will here recount the information submitted with the motion papers prepared by counsel.

**\*10** The DOC records reflect that each of the plaintiffs (except Smith, whose claim has already been dismissed) signed for an Inmate Handbook—which outlines the IGRP process—on arrival at AMKC. Receipt of such a handbook generally indicates that the inmates were informed of the grievance procedure so as to make that procedure "available" to them. *See Arnold,* 245 F.Supp.2d at 528. It alone is not, however, dispositive.

Plaintiffs' counsel argues that because the Handbook merely states that an inmate "may" request a formal hearing if he does not receive a response from his grievance from the IGRC,

it does not provide inmates with sufficient guidance on the grievance process. (*See* Ex. I.) Plaintiff Lloyd also asserts that the Handbook is "incomplete" in its description of the grievance procedure.

But to be excused from exhaustion on these grounds, Plaintiffs must show that "special circumstances" justify their failure to exhaust administrative remedies; specifically, that Plaintiffs relied on a "reasonable interpretation of the [DOC] regulations."*Hemphill,* 380 F.3d at 689. The suggested interpretation—that the use of the word "may" indicates that inmates are not required to complete the five-step procedure outlined in the IGRP and the Handbook before filing suit in federal court—is not reasonable. It is clear from the Handbook that the grievance procedure is a multi-step process that includes several levels of review. At Step 1, the Handbook instructs inmates that, "If you are not satisfied with the informal resolution, or do not receive a response to your grievance from the IGRC within five days (excluding weekends and holidays), you may request a formal hearing."(Ex. I.) At each subsequent step in the grievance procedure, inmates are instructed that if they are not satisfied with the determination at that step—whether it be the determination at the formal hearing, or the finding at a subsequent level of review—they have the option to pursue their grievance further. (*Id.*) They "may" proceed to that next step; they do not have to. The Handbook also clearly informs the inmate that, "If you do not receive a response to your grievance at any step of the Grievance Procedure within the time period required in Directive 3375R–A, you may proceed to the next step of the Grievance Procedure."(*Id.*) None of the plaintiffs have alleged that they relied on the interpretation Plaintiffs' counsel has offered to conclude that administrative remedies were "unavailable" to them.

The Handbook is not "incomplete" in the guidance it provides. Each of the five steps is clearly addressed in the Handbook, informing the inmate that he may: (1) file an initial grievance, (2) request a formal hearing, (3) appeal to the Warden, (4) appeal to the Central Office Review Committee (CORC), and (5) appeal to the Board of Correction (BOC). The Handbook does not go into the level of detail provided in DOC Directive 3375R–A, but it explicitly directs the inmate to that document and to the Grievance Office and the Law Library: "More detailed information on the timeframes and process for all the steps in the procedure is included in Directive 3375R. Copies of this Directive are available at the Grievance Office and the Law Library."(*Id.*)

**\*11** Thus, Plaintiffs' argument that the instructions provided in the Handbook are insufficient to inform inmates of the requisite procedure fails.

Several of the plaintiffs (Cowell, Lloyd, Barry, and Carr) argue that the theory of equitable estoppel prevents Defendants from raising the affirmative defense of non-exhaustion. In particular, Plaintiffs point to verbal threats and retaliatory acts by various corrections officers at AMKC as grounds for estoppel.

None of those acts was committed by the individual defendants in this case—the Commissioner of the DOC and the Warden of AMKC—and estoppel is generally understood to apply only to the defendant whose own actions inhibited the inmate from exhausting. *See, e.g., Hemphill* 380 F.3d at 688–89; *Martin,* 2012 WL 1392648, at *7. However, the allegation of threats or retaliatory acts may be relevant to an analysis of excuse on grounds other than estoppel.

### A. Plaintiff Victor Marte

Plaintiff Victor Marte has not submitted a declaration regarding his efforts to exhaust his administrative remedies.

According to DOC records, Plaintiff Marte did not submit any grievances regarding inadequate conditions for practicing his religion at the facility.

Plaintiff Marte filed his original complaint in the instant suit on April 26, 2012.

The City has submitted a copy of an inmate intake card bearing Marte's signature, acknowledging his receipt of the Inmate Rulebook and Inmate Handbook. (Ex. Q.)

According to DOC records, Marte filed one other grievance while he was detained at AMKC, dated June 7, 2009, unrelated to the issues in this suit. (Ex. H.) He also submitted a grievance on March 22, 2011, while he was housed at another DOC facility, GMDC, also unrelated to issues in this suit. He later withdrew that grievance.

Plaintiff Marte has not offered any evidence to rebut Defendants' submissions that he failed to exhaust his administrative remedies; neither has he established that he is or might be excused from exhaustion for one of the three reasons outlined in *Hemphill.*Plaintiff Marte's claims are, therefore, dismissed.

### B. Plaintiff Winston Cowell

Plaintiff Winston Cowell was incarcerated at AMKC from February 2010 until December 17,2012.

On April 20, 2012, Cowell filed a grievance requesting access to a masjid in order to pray and "proper reading materials without having to wait for donations."(Ex. D.) He filed the grievance by depositing it in a grievance box located in the officers' area nearby. Cowell did not complete any other steps in the grievance process before filing his federal complaint.

On April 25, 2012, five days after filing his grievance, Cowell filed his original complaint in this suit.

Cowell claims that when he did not hear back about his grievance by April 25, 2012, he believed that no further steps were required before he filed suit. He recalls speaking with Imam Malik before filing his complaint, and along with Plaintiffs Dorian Carr and Charymar Brown, showing the Imam their complaints.

**\*12** An "Inmate Grievance Form," dated May 8, 2012 and signed by Cowell at the bottom of the page, indicates that he requested a hearing on his grievance by the IGRC. (Ex. D.) Cowell claims that he was not offered a formal hearing, which is why he filed his complaint in federal court on April 25, 2012. Cowell does not explain the discrepancy in the above dates. From those dates, it appears that he filed his federal complaint before he requested a hearing on his grievance.

Cowell explains that the reason he never completed any further steps in the grievance process was because he believed that, after filing a grievance, he was supposed to hear back from the office within 3 to 5 days. He claims that he was aware of the grievance process only from overhearing an "Officer Candice" in 2011, when he was housed in Q14 or Q16. Cowell overheard the officer talking to other inmates about filing grievances, and he heard her say that after the inmates filed a grievance, they would hear back in 3 to 5 days.

Cowell also alleges that on several other occasions, when the issue of inadequate accommodations for Muslim inmates was raised to officials at the prison, no one mentioned anything about a grievance process. In 2011, at a meeting for the housing area Q15L, the issue was raised directly to the Warden and several Deputies and Captains. The officials responded that they would look into it, but did not mention anything about the grievance process. Similarly, in 2011, when housed in Q14L, Cowell and several other Muslim

inmates raised the issue to the Deputy Warden who was visiting the housing unit. The Deputy Warden apparently said he would look into it, but did not tell the inmates to file a grievance.

Cowell also avers that he and several other inmates spoke with Officer Candice about the problem on several occasions. But after they complained to the Deputy Warden, she got angry and said, "Why are you talking to the Warden, saying I'm not doing my job?"

Cowell does not recall seeing any signs in AMKC explaining the grievance process or any other source of information about the grievance process. He also asserts that he never went to the Grievance Office himself, because it is located in another housing area and, due to the escort policy, he would have needed an escort to go there.

The City has submitted a copy of an inmate intake card bearing Cowell's signature, acknowledging his receipt of the Inmate Handbook and the Inmate Rulebook. (Ex. M.) Cowell avers that he does not believe he ever received the handbook.

Plaintiff Cowell has not exhausted his administrative remedies. At best, he completed only the first two steps of the grievance process; and he filed his federal complaint on April 25, 2012—before he requested a formal hearing on May 8, 2012—and only five days after filing his initial grievance on April 20, 2012.

Cowell is not excused from failing to exhaust his administrative remedies. As with Lloyd, below, it is not patently unreasonable that Cowell assumed he would hear back from the Grievance Office within five days of filing his initial grievance, since that is what the IGRP provides. *See* DOC Directive 3375R–A IV.c-d. But Cowell has alleged no circumstances to demonstrate that he should be excused from pursuing the remaining steps in the grievance process before filing his lawsuit.

 **\*13** Cowell's primary argument is that administrative remedies were "unavailable" to him because prison officials never directly instructed him to pursue the grievance process, or told him that there were multiple steps that he would have to complete before filing his lawsuit in federal court. But Cowell indisputably received a copy of the Inmate Handbook, outlining the grievance process under the IGRP, when he was first admitted to the facility. He was also aware of the Grievance Office, but he never went to the office himself to

seek additional information about the grievance procedure. Absent any claims that prison officials made affirmative misrepresentations to Cowell about how the process worked, or frustrated his efforts to learn more about the procedure, providing Cowell with access to materials to educate him about the use of the grievance procedure was sufficient to render administrative remedies "available." *See Williams v. Suffolk Cnty.,* No. 11 Civ. 5198(JFB)(AKT), 2012 WL 6727160, at \*5 (E.D.N.Y. Dec. 28, 2012); *Arnold,* 245 F.Supp.2d at 538.

Cowell asserts that at the meetings purportedly held in 2011 with prison officials, discussing the inadequate accommodations for Muslim inmates, prison officials should have instructed inmates to file a grievance. But he does not allege that officials made any affirmative misrepresentations to the inmates, such as telling them not to file a grievance or implying that their claim was non-grievable. Instead, the meetings appear to have been an informal resolution process for discussing the inmates' complaints; there is nothing to suggest that administrative remedies were unavailable simply because they were not specifically offered as a potential remedy at these meetings. Moreover, Cowell was aware that the grievance procedure existed when he filed his initial grievance in the instant matter in April 2012 (if not earlier).

From what he overheard Officer Candice saying, Cowell incorrectly concluded that there was only one step in the grievance process—to file an initial grievance. Even according to Cowell's allegations, that is not the import of what Officer Candice said: she was apparently informing inmates that, after filing an initial grievance, they should hear back from the Grievance Office within 3 to 5 days; he does not allege that she indicated that there were no further steps in the grievance procedure.

But it makes no difference. Cowell did not speak with Officer Candice directly, and she did not make any affirmative misrepresentations to him about the grievance process. What distinguishes Cowell's situation from Lloyd's, below, is that Cowell fails to allege that he received inaccurate guidance about how to pursue his grievance. He had the handbook and he was aware of the Grievance Office so he could learn more about the grievance procedure; nothing more is necessary to render administrative remedies "available."

Neither does Cowell's assertion that the Imam reviewed his and the other inmates' complaints before they filed them demonstrate that grievance procedures were "unavailable."

It is well settled that complaints and communications made outside of formal grievance procedures do not satisfy the PLRA's exhaustion requirement. *See Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007). PLRA's exhaustion requires compliance with the prison's procedural rules; informal complaints to prison staff are insufficient. *See id.*The Imam is not a member of the Grievance Office, and Cowell had the resources available to seek out information about the grievance process.

**\*14** Cowell is also not excused based on his allegations of retaliation, either on the theory of unavailability of remedies or estoppel. Officer Candice's purported angry comment to Cowell and other inmates after they complained to the Warden about the inadequate accommodations for Muslims does not appear to have anything to do with the filing of Cowell's grievance in this action. Even if it did, Cowell filed his grievance anyway; he also requested a formal hearing when he heard back from the Grievance Office. It is well-settled that a claim of retaliation is insufficient to excuse an inmate from exhaustion when he files a grievance anyway, because "it is apparent that a reasonable person of ordinary firmness in [the inmate's] position, as well as [the inmate] himself, would not have thought that administrative remedies were unavailable."*Rivera,* 2012 WL 383941, at \*4. Since Cowell filed a grievance anyway, it also cannot be said that he "reasonably underst[ood] that pursuing a grievance through the administrative process [would] be futile or impossible," in order to estop Defendants from asserting an exhaustion defense. *Kasiem,* 756 F.Supp.2d at 577.

Finally, Cowell points to no "special circumstances," such as a reasonable misunderstanding of the grievance procedure, to excuse the requirement to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689.

Plaintiff Cowell's claims are, therefore, dismissed.

## C. Plaintiff Devon Lloyd
Plaintiff Devon Lloyd was incarcerated at AMKC from mid-April to mid-May 2012.

On April 27, 2012, Lloyd filed a grievance requesting a masjid to pray in and proper reading materials. (Ex. G.) He filed the grievance by depositing it in the grievance box in the law library. Lloyd did not complete any other steps in the grievance process.

On May 3, 2012, six days after filing his grievance, Lloyd filed his original complaint in the instant suit. Obviously, Lloyd did not have time to complete the exhaustion process before he came to court. In these circumstances, it is hard to say that exhaustion was excused—it was short-circuited.

However, Lloyd avers that, around two weeks after he filed his grievance, an inmate working for the Grievance Office and a civilian visited him in his dorm and delivered a form to him. He alleges that these individuals informed him that there was nothing that AMKC could do about his grievance. They said, "We are not able to deal with this. Someone else has to address it. It has to be someone higher up, a Captain or a Dep." They also told him that someone would look into his grievance and deal with it at a future date, but that in the meantime, he should "Wait it out. See what comes. Calm down."

In other words, Lloyd was told that the grievance process was not available to him for this particular prison condition.

According to Lloyd, the two individuals told him that he should sign the form they brought. They explained that, by signing the form, he would agree that he was satisfied that his complaint was resolved. Lloyd avers that he initially refused, telling them that his grievance had not been resolved and that he did not agree with the resolution. When he refused to sign the form, they allegedly told him, "Just because you disagree doesn't mean you can't sign the form."Eventually, Lloyd signed the form. He avers that he understood that, by signing the form, he was indicating only that the individuals had visited him and that his grievance had been heard, not that he accepted the resolution.

**\*15** The "Inmate Grievance Form" that Lloyd signed is dated May 8, 2012. (Ex. G.) At the bottom of the page, it states, "The IGRC proposes to informally resolve your grievance as follows: Grievant was informed, according to Imam Malik, DOC doesn't afford a structural mosque. Doc [*sic* ] does afford an area to hold religious services for one (1) hour per week. The city does not provide religious reading material, only the Koran, when it's donated from the outside."(Ex. G.) Beneath this statement, Lloyd signed next to a line that states "This informal resolution is accepted." (Ex. G.)

According to Lloyd, after he signed the Inmate Grievance Form, he waited to hear from the Grievance Office but was never contacted by anyone. No one mentioned anything to

him about an appeal or a hearing, or that he could or should request one.

A week earlier, Lloyd was presented with a similar form concerning a different grievance he had filed—a grievance about his mattress. He refused to sign it.

On May 15, 2012, Lloyd was transferred to the Otis Bantum Correctional Facility ("OBCC"). He claims that there was no reason for his transfer, since he did not have any misbehavior reports.

Lloyd further asserts that, during his entire time at AMKC, he was never told about any other steps in the grievance process. Lloyd does not recall seeing any signs in the housing unit where he resided, or anywhere else, regarding grievance procedures. He recalls seeing a sign for the Grievance Office in the law library, but it did not go into detail about filling out a grievance form or about the grievance process. Lloyd believed, from what other inmates told him, that the grievance procedure was to file a grievance and then wait for a response.

The City has submitted copies of two different inmate intake cards, bearing Lloyd's signature and acknowledging his receipt of the Inmate Rulebook and the Inmate Handbook on June 21, 2011 and September 19, 2011. (Ex. P.) Lloyd recalls receiving a copy of the Inmate Handbook, but he claims that it was "incomplete with respect to the grievance process."The Court does not know whether he means that it did not contain the process at all, did not sufficiently explain the process, or that his particular copy was somehow "incomplete." Lloyd has not produced a copy of his incomplete handbook.

In August 2012, Lloyd took several other actions related to his complaints about the inability to properly practice his religion while at AMKC. He avers that, on the advice of Hugh Smith and Victor Marte, he wrote a letter to Commissioner Schriro. He received a letter from her office dated September 26, 2012, stating that the letter had been received and was being forwarded to the appropriate unit for investigation. (Lloyd Deck, Ex. A.) He has not received a response. He also recalls writing to Warden Rivera, but has not received a response. He also called the Prisoners' Rights Project and spoke with someone there.

**\*16** In addition to his grievance submissions at AMKC, Lloyd filed two grievances, dated March 22, 2012 and July 12, 2012, while detained at another DOC facility, GMDC, on unrelated issues. Those issues were deemed non-grievable.

Plaintiff Lloyd has not exhausted his administrative remedies as of the date he filed his complaint. On May 8, 2012, when he signed the document apparently accepting the "informal resolution" proposed to him (which was, in fact, no resolution at all, but simply a restatement of the problematic conditions and an indication that nothing would be done). He had already filed this lawsuit. He expressed a lack of satisfaction with the "resolution" but failed to take an appeal.

However, there is an issue of fact as to whether Lloyd is excused from the requirement to exhaust an administrative remedy that was effectively "unavailable" to him.

Lloyd, like Cowell, assumed that he would hear back from the Grievance Office within five or six days of filing his initial grievance and that there were no further steps he needed to take in the grievance process before filing his federal complaint. As with Cowell, Lloyd's incorrect assumption alone is insufficient to demonstrate that administrative remedies were "unavailable," because Lloyd was provided with an Inmate Handbook that, if complete, outlined each step of the grievance process. *Arnold,* 245 F.Supp.2d at 538. Lloyd has failed to demonstrate that the Handbook he received was "incomplete" because he has not produced his copy.

However, in contrast to Cowell, prison officials affirmatively misrepresented to Lloyd that his issue was non-grievable and could not be addressed through the grievance process. This raises an issue of fact as to whether administrative remedies were in fact "available" to Lloyd.

Courts have held that, "An administrative remedy is not available, and therefore need not be exhausted, if prison officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it."*Medina v. Nassau Cnty. Sheriff Dep't,* No. 11 Civ. 228(JFB) (GRB), 2013 WL 4832803, at \*6 (E.D.N.Y. Sept. 10, 2013) (citing *Pavey v. Conley,* 663 F.3d 899, 906 (7th Cir.2011)); *see also Williams,* 2012 WL 6727160, at \*5; *Smith v. Woods,* 9:03–CV–480, 2006 WL 1133247, at \*15 (N.D.N.Y. Apr. 24, 2006)*aff'd,*219 F. App'x 110 (2d Cir.2007). Ostensibly, Lloyd's grievance was resolved, but the "resolution" offered by the Grievance Office was in fact no resolution at all—it was nothing more than a restatement of the status quo, the condition that Lloyd sought to challenge, and that the officers told him could not be challenged via the grievance process.

The instructions provided to Lloyd placed him in a situation analogous to an inmate who was not informed of the existence of the grievance procedure at all. *See Burgess,* 2004 WL 527053, at *3. He was told, "We are not able to deal with this," and to, "Wait it out. See what comes. Calm down."As a result, Lloyd could have reasonably understood that there were no other grievance procedures "available" to him. This is in direct contradiction to what is required under the IGRP: if an inmate does not hear back from the office within five days, he must appeal to the next step in the process to exhaust his administrative remedies; a failure by the office to respond to an inmate's grievance is not an excuse. *See, e.g., Salvatierra,* 2010 WL 5480756, at *17 (collecting cases). As one court wrote, "A prisoner who is told that the [IGRP] exists, but whose efforts to learn how he can avail himself of the [IGRP] are frustrated by correctional officials, is only marginally less ignorant of the grievance procedure than an inmate wholly unaware of the program."*Arnold,* 245 F.Supp.2d at 538.

**\*17** On these facts alone, a "similarly situated individual of ordinary firmness" would not have deemed grievance procedures "available." *Hemphill,* 380 F.3d at 688.

But these facts may also constitute "special circumstances" that excuse Lloyd from the exhaustion requirement. The officers allegedly told Lloyd to do nothing and sit tight rather than pursue what would be a futile grievance process. Affirmatively dissuading an inmate—even one who is familiar with the process—from following the grievance procedure by telling him that the only "resolution" is the status quo against which he protests because his complaint is not grievable may well mean that special circumstances exist to render the grievance process unavailable to the inmate. If jail officials made the statements attributable to them—literally telling Lloyd that the grievance process would not address his complaint contradicts information acquired about the grievance process from the Inmate Handbook. If an inmate reasonably believed what he was told, then no grievance process was available. The fact that the "resolution" was no resolution at all is powerful evidence in support of Lloyd's claim.

That Lloyd filed his federal lawsuit on May 3, 2012, several days before he purportedly received these instructions from the Grievance Office on May 8, 2012, does not change this analysis. Had Lloyd not received incorrect instructions, he could have appealed the "resolution" and so exhausted his administrative remedies, re-filing his federal complaint after doing so. But if he was told there was nothing further he could do because the issue was not grievable, he could have reasonably believed that continuing with the federal action he had already filed was fine, because no grievance procedure existed for his claim.

Lloyd also suggests that he was transferred to OBCC in retaliation for filing his grievance. While he was transferred on May 15, 2012—only several weeks after he filed his initial grievance on April 27, 2012—he does not offer "specific and detailed factual allegations" in order to support an inference that the transfer was retaliatory. *Friedl v. City of New York,* 210 F .3d at 85–86. He alleges only that he had no misbehavior reports, and therefore the transfer must have been retaliatory. But, as described in more detail below with respect to Barry's claim that his transfer was retaliatory, this is insufficient to support an inference of retaliation in this case.

In some cases, courts have found that an administrative remedy may properly be considered "unavailable" where the transfer occurs shortly after the incident at issue—here, several weeks after the grievance was filed. *See Hartry v. Cnty. of Suffolk,* 755 F.Supp.2d 422, 433 (E.D.N.Y.2010) (collecting cases). But a transfer between New York City-run facilities does not excuse the requirement to exhaust, because the grievance procedures are the same throughout all facilities. *See id.* at 434.Most important, the facts alleged do not demonstrate that the purported retaliatory transfer "deterred [Lloyd] from following regular procedures" in order to constitute a "special circumstance" excusing exhaustion. *Hemphill,* 380 F.3d at 690. By Lloyd's own account, he did not appeal his initial grievance because he did not know that there were any further steps in the process. While special circumstances surrounding the incorrect instructions that Lloyd received may have rendered his administrative remedies "unavailable"—an issue that will be determined at the hearing on Lloyd's excuses for exhaustion—Lloyd's transfer does not excuse his failure to exhaust administrative remedies.

### D. Plaintiff Mamadou Barry

**\*18** Plaintiff Mamadou Barry was housed at AMKC during the spring and summer of 2012.

Barry avers that, not long after he entered AMKC, a number of other inmates warned him that Muslim inmates who filed grievances complaining about their inability to practice their religion were put in solitary confinement, transferred out of AMKC, denied access to the law library, denied use of papers

and pens, denied access to food, written-up, and blackmailed. He also heard stories about grievances being ripped up.

Barry describes that, before he filed a grievance, he spoke with various prison officials on multiple occasions about the inadequate prayer facilities and other accommodations for practicing Muslims at AMKC. On May 26, 2012, he spoke with Officer Garcia. On June 5, 2012, he spoke with Officer Ward. On June 13, 2012, he spoke to Officer Wisher. On another date that summer, he spoke to Officer Jacobs. On other occasions, he asked other Captains and Officers for Muslim religious materials, including a kufi and prayer beads. They apparently told him "tough luck" and that he should not file a grievance because it would not be successful.

According to Barry, in July 2012, he also complained to Captain Balboa. The captain responded, "I'm just a cop for this area. I can't solve the problem."He allegedly told Barry to file a grievance, but did not give him any further instructions regarding the grievance procedure.

Barry further avers that, also in July 2012, he spoke to Captain Cruz about the fact that Muslims did not have an adequate place to pray, that their prayers were cancelled for officer basketball tournaments, and that many of them do not eat the "Halal" food because they know it is not Halal. Barry told Cruz that he was going to write a "copout" (slang for a grievance) and that, if he didn't get a response, he was going to file a legal complaint. Cruz warned Barry to be careful what he put on paper because AMKC was "his house." Barry asked Officer Cruz if that was a threat, who allegedly responded "you take it how you want."

Nonetheless, Barry says, he filed a grievance on July 8, 2012, requesting a masjid in which to pray and proper reading materials to practice his religion. He deposited the grievance in the grievance box. He has attached a copy of this grievance form, which he made prior to submitting the grievance, at Exhibit A to his declaration. (Barry Deck, Ex. A.) Barry did not complete any other steps in the grievance process.

The DOC has no record of Barry's grievance.

However, if Barry is believed, it seems clear he filed one because various corrections officers alluded to it over the next few weeks. For example, Barry describes that after he submitted the grievance, Officer Davis, a female officer working in his unit said to him: "I hope you know what you're getting into. You wrote a copout. You don't have to be smart

with me."She then gestured to him not to respond, so he did not say anything in response. Barry says he does not know how Officer Davis learned about his grievance because, to his knowledge, she was not involved in the AMKC grievance process. Barry also recalls Captain Cruz frequently joking about his grievance, sometimes calling him "Mr. Grievance Man" in front of others.

**\*19** Barry describes that he was afraid that the Captain or Officers would punish him for filing a grievance and revoke his law library privileges. At the time, he was preparing for his criminal trial and needed access to the law library for that purpose.

He asserts that, over the next several weeks, the conditions of his confinement worsened. For example, he claims he was repeatedly told that he could not attend study periods and Muslim prayer sessions because no Corrections Officer was available to escort him, as required. The "Halal" meals were often served cold in his housing unit, and he claims he was strip-searched more and more often, sometimes multiple times in one day. According to Barry, these were all new developments for him at AMKC.

On August 13, 2012, Barry filed his initial compliant in this suit. He asserts that he never received any response to his initial grievance, and filed his complaint in federal court because he understood that there was nothing more he could do with respect to his grievance. Although the complaint is dated July 29, 2012, he asserts that he did not immediately file the complaint because he wanted to try to resolve the situation through discussions with AMKC. When he realized that nothing was changing, he decided to file the complaint. He never appealed his grievance.

On August 13, 2012, the same date he filed his federal complaint, Barry was transferred out of AMKC. According to Barry, he was placed in a holding cell prior to the transfer along with approximately 12 other Muslim prisoners. Barry asked a Captain what was going on, explaining to the Captain that he had no misbehavior reports. The Captain allegedly responded, "We don't keep smart asses here. That's what smart asses get."

Barry claims that after he was transferred, no one advised him to follow up with his grievance. He claims that he did not know that he could or should appeal his grievance from another facility.

Barry avers that while at AMKC, he saw posters regarding the grievance procedure in two locations: by the medicine pickup and near the law library. According to Barry, the posters instructed inmates to file a grievance, but did not provide any further instruction about additional steps required.

The City has submitted a copy of an inmate intake card bearing Barry's signature, acknowledging his receipt of the Inmate Handbook and the Inmate Rulebook on December 12, 2011. (Ex. L.) Barry asserts that he does not believe he ever received an Inmate Handbook.

Plaintiff Barry did not exhaust his administrative remedies. While the DOC has no record of his initial grievance, Barry claims he filed one on July 8, 2012. Even so, he does not contend that he completed any of the remaining steps in the grievance process before or after filing his federal complaint on August 13, 2012.

Barry is not excused from the requirement to exhaust his administrative remedies.

He contends that administrative remedies were "unavailable" to him because he was never told that he had to complete the multi-step grievance process before filing his federal complaint; he was aware only of the first step in the process, which required that he file an initial grievance. As with nearly all of the other plaintiffs in this suit, however, Barry received an Inmate Handbook upon his arrival at AMKC. He is, therefore, charged with familiarity with all steps of the grievance process, as outlined in that Handbook; as a result, it was not objectively reasonable for him to think that nothing else was required. *See Hemphill,* 380 F.3d at 688; *Arnold,* 245 F.Supp.2d at 538.

 **\*20**  None of the prison officials told Barry that his issue was non-grievable or inaccurately described the steps he needed to take to pursue it. *See, e.g., Medina,* 2013 WL 4832803, at \*6. In fact, in response to Barry's complaints, Captain Balboa told him he should file a grievance. While some other officers also allegedly told Barry that he should not file a grievance because it would not be successful, this is not the same as telling an inmate that his issue *could not* be addressed through the grievance process. Barry filed a grievance anyway, demonstrating that a "reasonable person of ordinary firmness" in his position, including himself, "would not have thought that administrative remedies were unavailable" simply because an officer told him it would not be successful. *Rivera,* 2012 WL 383941, at \*4. Even if Barry

did believe that his grievance would be unsuccessful because of what the officers told him, his perception that the grievance program would be ineffective or futile is insufficient to negate the PLRA's exhaustion requirement. *See Shariff,* 655 F.Supp.2d at 286. It is only when a prison official tells an inmate that he *cannot* pursue his grievance through the administrative procedure—as opposed to merely that he is unlikely to be successful—that administrative remedies are objectively rendered "unavailable."

The most pertinent issue with respect to availability, however, is that any statements made by these officers were not the *reason* that Barry failed to exhaust his administrative remedies. They might have discouraged him from filing the initial grievance, but he did that anyway. As Barry himself explains, the reason he failed to complete all of the steps in the grievance procedure is that he did not know there were any other steps. That alone is not enough to excuse exhaustion where an inmate is provided with a manual outlining the procedure itself. *See Arnold,* 245 F.Supp.2d at 538.

Barry also asserts that the Grievance Office lost his grievance form, suggesting that the grievance program was so ineffective as to render it "unavailable" to him. While at least one court has held that a "failure to file [an inmate's] letters could be viewed as rendering the administrative remedies unavailable," or could estop the defendants from asserting exhaustion as a defense, *Jackson v. Baker,* No. 9:09–CV–249 (FJS/RFT), 2010 WL 7786192, at \*6 (N.D.N.Y. Aug. 19, 2010), Barry's assertion alone is not enough to render the entire program "unavailable." While Plaintiff Brown's allegations, below, that the grievance program was unavailable because forms were frequently lost and the grievance office was understaffed raise a question of fact as to whether the grievance program was available to *Brown*— taking into consideration all of Brown's alleged circumstances together—that is not the case here. *See Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004). A single lost grievance form would not alone "understandably lead usually uncounseled prisoners to fail to grieve in the normally required way."*Id.* Barry could have re-filed his grievance or sought to "appeal" his grievance when he did not hear back from the Grievance Office within five days after filing the initial grievance.

 **\*21**  In addition, none of Barry's claims of purported retaliation while he was housed at AMKC indicates that he should be excused from the requirement of exhaustion. Despite the allegations, Barry filed his grievance in this action on July 8, 2012. By his own account, he waited to file his

complaint to try to resolve the situation through discussions with AMKC; he does not assert that any of the interactions he had with the officers there discouraged him in any way from taking further action at the facility, the primary factor for demonstrating excuse on the grounds of retaliation, whether based on unavailability, estoppel, or special circumstances. *See Hemphill,* 380 F.3d at 686–91; *Black v. Fischer,* No. 12 Civ. 2341(CM), 2013 WL 1314940, at *8–9 (S.D.N.Y. Mar. 28, 2013); *Kasiem,* 756 F.Supp.2d at 577 (internal quotation marks omitted). Admittedly, Barry did not attempt to appeal his grievance (which was never received) before filing his federal complaint, because he was unaware that he needed to do so. As noted several times already, however, he had the resources available to him to learn about the grievance procedure.

Neither does Barry's transfer out of AMKC on August 13, 2012—the day he filed his federal complaint—constitute a "special circumstance" that excused him from the requirement to exhaust. While no one advised Barry to follow up with his grievance at the new facility, there is no requirement to do so. Because the grievance procedure is the same throughout the New York City-run facilities, and Barry was transferred to another City facility, his transfer does not excuse his failure to exhaust administrative remedies. *See, e.g., Key v. Toussaint,* 660 F.Supp.2d 518, 525 (S.D.N.Y.2009); *Finger v. Superintendent McFinnis,* No. 99 Civ. 9870, 2004 WL 1367506 (S.D.N.Y. June 16, 2004); *Sims v. Blot,* No. 00 Civ. 2524, 2003 WL 21738766 (S.D.N.Y. July 25, 2003).

Moreover, "many courts have found that where a plaintiff had an opportunity to meaningfully pursue the grievance while incarcerated at the facility where the grievance arose, the failure to exhaust those remedies was not excused by the plaintiff's transfer to a different facility. The rationale for not granting an exception to administrative exhaustion in these cases was that a plaintiff should not be 'rewarded' for failing to participate in grievance procedure before being transferred." *Hartry v. Cnty. of Suffolk,* 755 F.Supp.2d 422, 433 (E.D.N.Y.2010) (collecting cases). In this case, the IGRP provides that inmates should take the second step in the process—requesting a formal hearing on initial grievance— five days after they submit the initial grievance. Barry had more than a month to appeal his initial grievance before he was transferred out of AMKC, giving him a meaningful opportunity to do so. By his own account, Barry did not do so because he was not aware that he had to—as explained

above, that is no justification for Barry's failure to exhaust his administrative remedies.

**\*22** Plaintiffs' counsel asserts that the transfer of Barry (and Marte, Smith, and Lloyd)[1] to other facilities was retaliatory and an attempt to defeat his grievance, and failure to exhaust should be excused on those grounds. Counsel claims that transfer to another facility constituted grounds for dismissal of those plaintiffs' grievances because under DOC Dir. 3375R–A § IV(A)(4), the "Grievance Supervisor may dismiss and close the grievance if he/she determines that: ... (4) the grievance is institutional in nature and no longer affects a grievant who has been transferred from the facility where the grievance was originally lodged," suggesting that AMKC transferred Barry (and the others) in order to get rid of their grievances. The record does not reflect whether any of the plaintiffs' grievances were actually terminated as a result of their transfers.

Plaintiff Barry submits that there could have been no other reason for his transfer than retaliation because he had no misbehavior reports, and that a Captain told him he was being transferred because he was a "smart ass." But Defendants have submitted the Declaration of Nina Powers, a Deputy Warden at GMDC, who explains that the "transfer of inmates between DOC facilities is a routine practice-transfers occur regularly for security reasons and due to inmate classification and sentencing."(Powers Decl. ¶ 8.) In light of the fact that inmates may be transferred for routine reasons, Barry's bare allegation is insufficient to support an inference that his transfer was retaliatory and connected to the filing of his grievance. Moreover, Barry was transferred to GMDC, a facility that does have a mosque used exclusively for Muslim services—suggesting that his transfer was not "punishment" for filing a grievance.

Finally, Barry does not claim that his transfer was the reason why we failed to pursue his administrative remedies; he simply did not know that there were additional steps in the process that he should and could pursue. After considering the "interplay between the alleged [retaliation]" and Barry's failure to complete all of the steps in the grievance process, I find that there is no connection to excuse Barry from the requirement to exhaust on the grounds of special circumstances. *Hemphill,* 380 F.3d at 686–91.

Plaintiff Barry's claims are, therefore, dismissed.

### E. Plaintiff Dorian Carr

Plaintiff Dorian Carr was incarcerated at AMKC from July 12, 2011 through January 16, 2013.

The City asserts that there is no record of any grievances filed by Carr while he was at AMKC. An email from one of the prison officials, included in Exhibit B submitted by the City, indicates that Carr did file something while at AMKC on April 26, 2012, but there is no record of the grievance form itself. Carr, on the other hand, avers that, while he was housed at AMKC, he submitted a total of six grievance forms regarding the lack of proper religious accommodations for Muslims, between early February 2012 and December 2012.

**\*23** Carr did not receive a response to any of the grievances he allegedly filed, and he never took any further steps in the grievance process. According to Carr, he did not understand that there was anything more he could do.

Carr understood that doing so could be dangerous. He had heard from other inmates that some people had ended up in solitary confinement for filing grievances, and that one inmate was assaulted by an officer for filing a grievance.

Carr explains that he filed his six grievances, despite the stories he heard.

Carr claims he filed his first grievance in February 2012, regarding the poor preparation of "Halal" meals in the kitchen. Since there were no grievance boxes in his area of the facility, he was instructed by DOC staff to slip his grievance under the door of the grievance office. Although he had concerns that his grievance might get lost or would not remain confidential, he left it under the door. He received no response to this grievance.

In early April, he complained to a Captain about having to pray in the gymnasium, which had a leaky roof, and asked for an alternative space. The Captain allegedly responded that there was nothing he could do and told him to speak to the Imam. Carr describes that the Captain "sarcastically" told him to file a grievance.

Carr then spoke to the Imam about the conditions in the gymnasium, who told him that he could file a grievance but that it would not make a difference. The Imam told him that he had spoken with prison officials about the lack of a mosque, but they kept telling him there was no space for one.

According to Carr, he filed a second grievance in April 2012, regarding adequate prayer space. The form was dated April 26, 2012, and he made a copy of the grievance before he filed it, which is attached as Exhibit A to his declaration. On April 30, 2012, he filed the grievance by placing it under the door of the grievance office, as he had been instructed.

Carr asserts that he filed four other grievances related to similar issues raised in his first two grievances. He filed these by placing them in a newly-placed grievance box in his housing area. He does not indicate when those grievances were filed.

According to Carr, around Thursday, May 3, he went to the Grievance Office to check on the status of his grievance. Officer Jefferson, who runs the Grievance Office, allegedly asked him, "Why didn't you go to the Imam?"Carr explains that he understood the Officer's question to mean, "Why did you even file a grievance?"Officer Jefferson then allegedly said to Carr, "Once this is filed, watch out. They will be coming."Carr understood this to mean that security would be coming for him.

At that same visit, a female civilian apparently told him that his grievance had not yet been processed, but that he could check again on Friday. According to Carr, she did not tell him that he needed to follow any other steps to complete the grievance process.

**\*24** Shortly after he filed his second grievance in April 2012, prison guards allegedly retaliated against Carr and others in his housing unit. While the other units were allowed to attend prayer services, he and other Muslims in his unit were not allowed to do so on multiple occasions. Carr also claims he was singled out because of his grievance: he asserts that prison guards came to his cell and rifled through his personal documents on approximately 12 occasions after he filed his grievance.

On May 16, 2012, Carr filed his original complaint in this suit. The complaint is dated April 26, 2012 because he used a version that had been prepared by other inmates.

The City has submitted copies of three different inmate intake cards bearing Carr's signature, acknowledging his receipt of the Inmate Handbook and Inmate Rulebook on October 28, 2010 and March 8, 2012; there is no date on the third card. (Ex. K.) Carr does not mention any of the inmate intake cards

in his declaration, nor whether he ever received an Inmate Handbook.

With respect to issues unrelated to the instant suit, Carr has previously filed three grievances, in November and December of 2010, while housed at the Vernon C. Bain Correctional Center. (Ex. B.) On each occasion, he received a response within one to three days. (Ex. B.) Carr asserts that, as a result, he understood that in the grievance process, he was supposed to receive a response within several days of filing a grievance.

Plaintiff Carr has not exhausted his administrative remedies. The DOC has no record of any grievances he filed at AMKC. Carr alleges that he filed six initial grievances between February and December 2012, including on April 26, 2012, but he does not allege that he completed any of the remaining steps in the grievance process before filing his federal complaint on August 13, 2012.

Carr is not excused from exhausting his administrative remedies.

Carr contends that administrative remedies were "unavailable" to him because he did not know that he needed to appeal his initial grievance—and complete the other remaining steps in the grievance procedure—before filing his federal complaint. But Carr indisputably received the Inmate Handbook upon his arrival at AMKC; he is therefore charged with familiarity with the procedure outlined in the Handbook. *See Arnold,* 245 F.Supp.2d at 538.

Carr is not excused from the requirement to exhaust for the same reasons that Barry and Cowell are not: he was provided with access to materials to learn about the grievance procedure, and nothing that prison officials said or did contradicted this information; Carr was not misled into thinking that his issue was either non-grievable, or erroneously instructed that the steps in the grievance procedure were somehow different from those outlined in the Handbook. *See, e.g., Medina,* 2013 WL 4832803, at *6. The purported statement by the female civilian at the Grievance Office that his grievance had not yet been processed, and he should check again in a few days, would not indicate to a "similarly situated individual of ordinary firmness" that grievance procedures were unavailable. *Hemphill,* 380 F.3d at 688. In fact, it suggests that the grievance procedure *is* available to him; Carr does not indicate whether he returned to the office later to check on his grievance, or ask what he should do next.

**\*25** Neither does a Captain's alleged statement to Carr that he could do nothing about the inadequate prayer space for Muslims indicate that the grievance procedure was not available to address his issue; the Captain purportedly told Carr to file a grievance about it—sarcastically or not—and that is exactly what Carr did. The Captain's statement did not prevent him from availing himself of the grievance procedure. Carr allegedly continued to file grievance after grievance during the period of alleged unavailability—over the course of 11 months—making it "apparent that a reasonable person of ordinary firmness in [Carr's] position ... would not have though that administrative remedies were unavailable." *Rivera,* 2012 WL 383941, at *4.

Similarly, the Imam's statement to Carr that he could file a grievance but it would not make a difference does not render Carr's administrative remedies "unavailable." The Imam did not indicate to Carr that the grievance process was unavailable to address Carr's issue, only that it would not be successful. "The alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies when Congress has specifically mandated that he do so." *See Giano,* 250 F.3d at 150–51.

Moreover, it is questionable whether an incorrect statement by the Imam about grievance procedures would, as an objective matter, indicate to an inmate that administrative remedies were not available to him as outlined in the Inmate Handbook. It is well settled that complaints and communications made outside of formal grievance procedures do not satisfy the PLRA's exhaustion requirement. *See Macias,* 495 F.3d at 44. The Imam is not a member of the Grievance Office, and Carr had the resources available to seek out information about the grievance process.

Carr also alleges that he was threatened and retaliated against for filing a grievance, asserting that he should be excused on grounds of estoppel or special circumstances. But Carr's declaration alone demonstrates that despite any danger he perceived from filing grievances at the facility, he went on to file six grievances between early February 2012 and December 2012, including after he filed his initial complaint in federal court on May 16, 2012. None of the purported actions by the prison officials led Carr to "reasonably unders [tand]" that the grievance process would be futile or impossible, or that the grievance process was unavailable; he does not even claim as much. *See Kasiem,* 756 F.Supp.2d at 577; *Rivera,* 2012 WL 383941, at *4.

As with several of the other plaintiffs, the crux of Carr's claim is that he failed to exhaust his administrative remedies because he did not know that there were any steps in the grievance process other than the first step of filing an initial grievance. But his ignorance is not an excuse where he had access to materials to learn about the grievance procedure, he was not incorrectly instructed about the grievance procedure, and prison officials did not do anything that objectively prevented him from availing himself of that procedure.

**\*26** Plaintiff Carr's claims are, therefore, dismissed.

### F. Plaintiff Brandi Simmons

Plaintiff Brandi Simmons was incarcerated at AMKC for various periods of time beginning in 1990 and is currently incarcerated there.

Simmons asserts that he complained about the poor accommodations for practicing his Muslim religion on various occasions over the last several years. He recalls that at one point an officer suggested that he file a grievance. Afterward, he and Plaintiff Dorian Carr spoke to Imam Malik, who advised them that if the officer recommended that they file grievances, they should do that.

In June 2012, Simmons also complained informally to Officer Jefferson, who runs the Grievance Office. According to Simmons, Officer Jefferson told him that the issue was "non-grievable," and that budget cuts were to blame. He allegedly told Simmons to contact Warden Rivera.

Simmons avers that, based on his conversation with Officer Jefferson, he understood that the grievance process was unavailable to him with respect to the issues in this case. Nevertheless, because he had read several legal cases involving the grievance process in the law library, he knew that he could not file a lawsuit without filing a grievance first. So, he says, he filed a grievance anyway.

Simmons asserts that he filed a grievance on June 20, 2012. A copy of his grievance formed is attached at Exhibit A to his declaration. The DOC has no record of Simmons's grievance.

No one at AMKC ever contacted Simmons about his grievance, and Simmons did not take any further steps with respect to the grievance process.

On July 9, 2012, Simmons filed his complaint in the instant suit.

According to Simmons, his understanding of the grievance process was that, once he filed a grievance, the Grievance Office was supposed to get back to him with an answer. He did not know that he personally was supposed to take any further steps after filing his initial grievance. Simmons explains that he was never informed of any other grievance procedure; he was never told anything about having to appeal or request a hearing. He relied on word of mouth and his research in the prison law library to learn about the grievance process.

Simmons also does not recall seeing any signs at AMKC regarding the grievance process. He recalls seeing signs at "C–95 intake" and the law library referring to the Grievance Office, but no instructions about how to file a grievance.

Simmons does not recall ever receiving copies of the Inmate Rulebook and the Inmate Handbook. The City has submitted a copy of an inmate intake card with Simmons's signature, acknowledging receipt of those materials. (Ex. J.) There is no date next to his signature.

Simmons has submitted grievances in the past relating to other matters not at issue in this case. Those matters were all either resolved or deemed non-grievable; Simmons has never appealed any grievances. (Ex. A.)

Plaintiff Simmons has not exhausted his administrative remedies. The DOC has no record of a grievance filed by Simmons. Simmons claims that he filed a grievance on June 20, 2012, but he has not alleged that he completed any of the remaining steps in the grievance process before he filed his federal complaint on July 9, 2012.

**\*27** There is an issue of fact as to whether Simmons is excused from the requirement to exhaust administrative remedies. While Simmons received an Inmate Handbook and thus had access to information about the grievance procedure, he has alleged that he was specifically told by Officer Jefferson—who works in the Grievance Office—that his complaint about inadequate accommodations for the practice of the Muslim religion was "non-grievable." Simmons filed a grievance anyway, because he had some knowledge that he needed to pursue the grievance process before filing a federal complaint. But when Simmons heard nothing about his grievance, he could have reasonably inferred that the issue

was in fact non-grievable, as Officer Jefferson purportedly suggested. For the same reasons outlined above with respect to Lloyd, special circumstances may justify Simmons's failure to exhaust his administrative remedies because Officer because Officer Jefferson allegedly misrepresented that his issue was non-grievable. *See, e.g., Medina,* 2013 WL 4832803, at *6.

The Court will hold a hearing on the issue of whether Simmons is excused from the requirement to exhaust.

### G. Plaintiff Chayrmar Brown

Plaintiff Chayrmar Brown was incarcerated at AMKC at various points in time from 1996 through 2013.

Brown avers that he raised his concerns about inadequate accommodations for Muslim inmates to practice their religion on various occasions.

When he was at AMKC in 2009, Brown was the inmate delegate for his housing unit, and attended meetings once a week in that capacity. He asserts that around once a month, he raised the issue of the contamination of Halal food with Deputy Canty, Deputy Major, and Captain Yogi. They allegedly told him they would look into it, but nothing changed.

When Brown returned to AMKC in 2012, he again served as the inmate delegate in his housing unit, attending delegate meetings once a week. Around one to two times a month, he and other Muslim inmates would complain about the contaminated Halal food, the gym's leaky roof, and the lack of a masjid at AMKC. Captain Yogi, Captain Rutherford, and Captain Gross were in attendance at these meetings; Deputy Hill attended twice. Grievance Officer Jeffery and/or his assistant were often in attendance.

According to Brown, the response from these prison officials was always the same: they told the inmates they would look into the problems and told them to file grievances. Brown and the other inmates responded that they had already filed grievances. Captain Gross allegedly told them that someone would attempt to locate the grievances. Grievance Officer Jeffery apparently warned the inmates that the Grievance Office was understaffed.

Brown further avers that, on multiple occasions during inmate delegate meetings between approximately August 2012 and February 2013, he specifically approached Grievance Officer Jeffery, who often sat in the back of the meetings. Brown raised the issue of the lack of a masjid, the leaky gym, and the contaminated Halal food. Officer Jeffery told him that the Warden of AMKC and the City of New York were looking into these issues.

**\*28** On these occasions, Brown claims he told Officer Jeffery that the inmates' grievances were not being answered. On each occasion, Jeffery told him that he lacked the requisite manpower to answer all of the grievances he received. He did not suggest that Brown file a grievance. He did not say anything about the possibility of appealing or requesting a formal hearing, or that these were necessary steps in the grievance process.

On one occasion, Officer Jeffery also told Brown that grievance boxes were so full that other inmates were able to reach in and remove grievances from the box. Brown also avers that he personally had seen inmates take grievances out of a grievance box so they could use the paper for other purposes.

On approximately three to four occasions between August 2012 and February 2013, the kitchen supervisor came to speak at the inmate delegate meetings. He told the inmates that they would make sure that the general population food did not mix with the Halal food, but nothing changed.

Brown asserts that he filed two separate grievances while housed at AMKC. The first was filed in 2009, when Brown was housed in the West facility. It concerned the lack of Halal food and the fact that Halal trays were contaminated by non-Halal food. Brown states that he placed his grievance in the grievance in the box near the West gate, but that he never received any response.

Brown asserts that he filed his second grievance in late summer 2012. It concerned the leaky gym roof and the need for a masjid at AMKC. Brown used a grievance form that had already been filled out by one of the other inmates, and he filed it. The form had already been filled out and it was dated April 2012, but Brown avers that he did not file it until late summer 2012. A copy of the grievance form he submitted is attached at Exhibit A to Brown's declaration.

The DOC has no record of Brown's grievance ever being filed at AMKC.

Brown alleges that inmates submitted grievances regarding the lack of Halal food back in 1996, and nothing came of it.

He also avers that he knows from personal experience that the grievance box at the west gate in AMKC is rarely emptied. In 2012, his job was to deliver newspapers and pass out and pick up the payroll forms. This required him to walk by the grievance box many times a day. He never saw the box emptied. It was always overflowing with papers. In fact, he heard corrections officers joke that the box was so packed and so rarely emptied that it was gathering dust.

After he filed his grievance in the grievance box near the West gate in 2012, Brown claims he waited approximately one month, but that he received no response. He did not know there were any other steps he should take.

Nonetheless, he sent a letter to Commissioner Doro Schriro and a letter to the Board of Correction about the need for a masjid and the contamination of the Halal food. He never received any responses.

Approximately one and a half months after filing his grievance, Brown still had not received a response. Since he did not know that he was required to take any additional steps, he decided to file a lawsuit. Other inmates provided him with a photocopy of a filled out complaint.

**\*29** Brown filed his original complaint in the instant action on October 19, 2012.

Brown does not recall ever receiving an Inmate Rulebook or an Inmate Handbook. The City has submitted a copy of an inmate intake card bearing Brown's signature, acknowledging the receipt of those materials on April 7, 2012. (Ex. O.) Brown explains that on the day he was incarcerated, he was undergoing withdrawal for substance addiction, and that he does not recall signing any papers. When he came out of withdrawal a couple days later, he claims he only had a property receipt and bed sheets in his possessions; he did not have the rulebook or handbook.

Brown never filed any other grievances related to this matter or any other matters.

Brown has not exhausted his administrative remedies. The DOC has no record of any grievance filed by Brown related to this action. Brown claims that he filed initial grievances in 2009 and in late summer 2012, but he has not alleged that he

took any further steps in the grievance process before filing his federal complaint on October 19, 2012.

There is, however, an issue of fact as to whether administrative remedies were "available" to Brown.

Brown contends that he was aware only of the first step in the grievance procedure, and that he never completed any of the remaining steps before filing a federal complaint because he did not know about them. However, unlike some of the plaintiffs, even though the City has submitted an inmate intake card with Brown's signature indicating that he received an Inmate Handbook upon his arrival at the facility, Brown pleads facts that call the card into question. He avers that he was in withdrawal at the time he entered the facility, and that he had no Handbook when he came out of withdrawal. So the signature on the card may therefore be meaningless. There is no evidence that Brown was given the Handbook when he could actually know what was happening. This presents an issue of fact as to whether Brown can be charged with familiarity of the grievance procedure, since he may not have been provided with the Handbook at all, or been in such a state that he could not appreciate what it was or hang onto it—if he was indeed in withdrawal. That should be ascertainable from prison records.

According to Brown, he was also told by a grievance officer that the facility could not process all the grievances it receives. The jail has no choice but to process all grievances and if it does not do so then there is no procedure available for those whose grievances were not processed. At least one court has held that a "failure to file [an inmate's] letters could be viewed as rendering the administrative remedies unavailable," or could estop the defendants from asserting exhaustion as a defense. *Jackson,* 2010 WL 7786192, at \*6. Brown's allegations about the failure to empty the grievance box call into question whether any grievance procedure was available to him, especially considering that the DOC has no record of his grievance, and he claims to have filed it in a grievance box that, to his knowledge, was almost never emptied.

**\*30** Finally, Brown's allegations raise an issue of fact concerning whether he tried to file his initial grievance. He says he did, but the Grievance Office has no record. Brown has alleged that the grievance box was rarely emptied, and that many inmates claimed to have filed grievances that were not addressed, creating a question of fact as to whether DOC lost the grievance or otherwise failed to process it.

There is, therefore, an issue of fact as to whether Brown is excused from the requirement to exhaust his administrative remedies, and the Court will hold a hearing on the issue.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiffs Smith, Marte, Cowell, Barry, and Carr. Before I can decide the motion insofar as it is directed to Plaintiffs Lloyd, Simmons, and Brown, the Court will have to hold a hearing to ascertain whether those plaintiffs are excused from exhausting their administrative remedies before filing this lawsuit. Because exhaustion remains a dispositive issue in the case, I do not reach the merits issues in Defendants' motion to dismiss. That motion is denied with leave to renew following the exhaustion hearing, if any of Plaintiffs' claims remain at that time. The Clerk of the Court is directed to remove the motion at Docket No. 55 from the Court's list of pending motions.

In addition, the Court notes that the plaintiffs who remain subject to the practices complained of in this action, but whose claims have been dismissed for failure to exhaust, can file a grievance, exhaust their administrative remedies, and file a new complaint, if they are still housed at AMKC.

The parties shall appear for a conference on October 4, 2013 at 11:30 AM to set a discovery schedule and a date for the hearing on exhaustion.

Footnotes

1       Those inmates' situations are discussed above.

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.